[Cite as *State v. Singleton*, 2024-Ohio-465.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 112588 |
| LEENEJA SINGLETON, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 8, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-668484-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Fallon Kilbane McNally, Assistant Prosecuting Attorney, *for appellee*.

Morse Legal LLC and Joseph P. Morse, *for appellant*.

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Leeneja Singleton ("Singleton") appeals from her convictions for felonious assault and other charges. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} This case stems from events that occurred on January 15, 2022. As a result of these events, on March 14, 2022, a Cuyahoga County Grand Jury indicted Singelton and her niece Raneka Singleton ("Raneka"), a codefendant,[1] on one count of improperly discharging into a habitation in violation of R.C. 2923.161(A)(1) and three counts of felonious assault in violation of R.C. 2903.11(A)(2). All four counts carried one-year firearm specifications, three-year firearm specifications, and five-year drive-by shooting firearm specifications.

{¶ 3} Singleton initially pleaded not guilty to the indictment.

{¶ 4} On May 31, 2022, Singleton and her counsel failed to appear for a pretrial hearing. On June 6, 2022, the court issued a capias for Singleton and she was arrested on June 9, 2022. On June 10, 2022, Singleton was placed on court-supervised release.

{¶ 5} On June 13, 2022, Singleton and her counsel appeared for a pretrial hearing. On August 2, 2022, Singleton failed to appear for a final pretrial hearing. Defense counsel informed the court that Singleton was at work.

{¶ 6} Throughout the course of pretrial proceedings, the state placed potential plea agreements on the record multiple times; Singleton repeatedly rejected the opportunity to enter into a plea agreement with the state, choosing instead to exercise her right to trial.

---

[1] Raneka subsequently entered into a plea agreement with the state, contingent on her testifying truthfully at Singleton's trial.

**{¶ 7}** On March 27, 2023, the case proceeded to a jury trial.

**{¶ 8}** On the evening of January 15, 2022, victim Keshijetta Young ("Young") was planning to go out for the night with Singleton and other friends. Young and Singleton had known each other since around 2009, and Young described them as good friends. Before going out for the evening, Young and Singleton dropped off Young's four-year-old son with Young's mother, Katricia Hampton ("Hampton"), at Hampton's home on Newman Avenue in Cleveland, Ohio. Young and Singleton then went to their apartment complex in Maple Heights to get ready to go out for the night, before going out to a bar in Garfield Heights, Ohio.

**{¶ 9}** A couple months prior to this incident, Young had sprained her ankle. On the night of January 15, 2022, she was wearing a brace. Young testified that she would frequently elevate her ankle, and she had her ankle elevated on a bar stool when she, Singleton, and their friend Tanesha Williams ("Williams") first arrived at the bar.

**{¶ 10}** According to Young, about 20 minutes after the women arrived at the bar, they were joined by Singleton's niece Raneka. Young testified that Raneka walked into the bar and stood next to Singleton; Singleton then got up from her barstool and went to the restroom. When Singleton returned from the restroom, Raneka was sitting in Singleton's barstool. Singleton walked over to Young and pushed Young's leg off the stool on which it was resting. This gave rise to a fight at the bar; the fight continued outside of the bar. At trial, the state introduced

surveillance footage from outside of the bar. The footage shows women fighting and being physically held back from one another by men. Young identified herself, Singleton, Raneka, and Williams in the video.

{¶ 11} Young testified that following the fight outside the bar depicted in the surveillance footage, she left the bar with Williams. Young testified that they went to her apartment before continuing to Hampton's house to pick up her son. Young testified that between the time she left the bar and arrived at Hampton's house, she was communicating with Singleton via phone call and text message. Young testified that the fight continued verbally and she told Singleton that she was going to Hampton's house.

{¶ 12} Young went on to testify that after she arrived at Hampton's house, Singleton and Raneka arrived in one car and Singleton's sister, Qiana, arrived in a second vehicle. According to Young, Qiana was in a white Mercedes-Benz truck and Singleton and Raneka were in a blue Toyota Corolla. Young explained that she recognized the vehicles because she had previously seen them at Qiana's house and Singleton's mother's house.

{¶ 13} At trial, the state introduced surveillance footage from Hampton's house showing Hampton's front porch and street. Young testified that the footage depicted her mother's house on January 15, 2022, and she identified both vehicles in the video. Young also identified Hampton, Williams, and herself on the front porch in the video. Young testified that when the cars drove down her mother's street, Singleton "was outside the window going back and forth with my mom" and

Singleton was being disrespectful to Hampton. Young testified that at one point, Hampton walked off the porch while Singleton was hanging out of the car and Singleton ultimately fired at Hampton's house. Young identified a noise in the video as a gunshot and testified that she knew the noise was a gunshot because she saw Singleton hanging out of the window of the car with a gun in her hand.

{¶ 14} According to Young, after Singleton fired at Hampton's house, Young and Hampton went back inside the house to check on Young's son. Young testified that her son was sleeping and was covered in glass, so she ran downstairs to get her mother, who was on the phone with police. Young testified that police told them to make sure that her son wasn't bleeding and "to shake all of the glass off of him," so they did so and waited for police to arrive.

{¶ 15} The state introduced photo evidence that Young identified as depicting her mother's house and, specifically, a broken window above where her son was sleeping. According to Young, police who responded that night did not locate a bullet, but a law enforcement official who responded to Hampton's house the next morning located a bullet in the window frame. The bullet did not enter the room but was lodged in the window frame.

{¶ 16} Hampton testified at trial, and her testimony largely corroborated Young's. According to Hampton, Young had informed her that Singleton had a gun on her at the bar. Therefore, Hampton testified that when Singleton and her sister drove down her street, Hampton was telling Young and Williams not to go outside because she was afraid of how the fighting would escalate. Hampton testified that

she did not think Young or Williams left the front porch and, at one point, she held Young back from leaving the porch and tried to push her inside. Hampton testified that she left the porch at one point because she wanted to take a picture of the license plate of the Corolla to give to the police. According to Hampton, Singleton was laying across the backseat of the car and Hampton ultimately did not take a picture because it was at this point that Singleton leaned out of the car and fired a gun towards Hampton's house. Hampton went back inside her house and called the police. The state introduced the audio of Hampton's 911 call at trial. Hampton told dispatch that Singleton had fired at her house; at trial, Hampton identified Singleton.

{¶ 17} Detective Michael Dunn ("Dunn"), a detective with the Cleveland Division of Police, testified that he was assigned to investigate the January 15, 2022 incident involved in this case. As part of his initial work on the case, Dunn reviewed the incident report and the body-camera footage from the responding officers and then contacted Young and other witnesses. Dunn testified that he took photos of a metal fragment that had been collected from Hampton's house; Dunn identified the object in the photos as a bullet fragment. The state also introduced the fragment as a physical exhibit at trial. Dunn testified that he also obtained surveillance footage from Hampton showing her front porch and the street in front of her house, as well as surveillance footage from the exterior of the bar where the fight between Singleton and Young started. Further, Young provided Dunn with text messages between herself and Singleton.

**{¶ 18}** Raneka also testified at trial against Singleton pursuant to the terms of her plea agreement. Raneka testified that Singleton is her aunt. She also testified that she knew Young because Young and Singleton were friends. Raneka testified that on the night of January 15, 2022, she went out to a bar with Singleton and Young; at that time, Raneka drove a small blue car. Raneka testified that Singleton and Young "exchanged words" at the bar. Raneka testified that she left the bar with another aunt, Cheneka, but at some point that night, Raneka drove Singleton to her house and to Hampton's house. According to Raneka, the women were yelling at each other outside of Hampton's house, but no one got out of her car at any point. When asked if Singleton had a gun that night, Raneka initially testified that she did not know and "it was all a blur." She subsequently testified that Singleton had a gun on her and that Raneka heard a gunshot but did not know where it came from.

**{¶ 19}** At the close of the state's case, defense counsel made a Crim.R. 29 motion for acquittal as to the improper discharge into a habitation charge, as well as the felonious assault charges against Young and Williams. The court denied this motion.

**{¶ 20}** On March 30, 2023, the court issued the standard jury instruction relating to deadlocked deliberations, commonly known as the *Howard* charge, *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), to the jury. Later that day, the jury returned a verdict of guilty on all counts and specifications.

**{¶ 21}** On March 31, 2023, the court held a sentencing hearing. The assistant prosecuting attorney, defense counsel, Singleton, and [victims] addressed

the court. The court sentenced Singleton to two to three years on the improper discharge into a habitation count, pursuant to the Reagan Tokes Law, and two years on the felonious assault charges, to be served concurrently. The court also sentenced Singleton to 11 years of mandatory firearm specification time. Singleton's total aggregate sentence was 13 to 14 years in prison.

{¶ 22} Singleton filed a timely notice of appeal and raises three assignments of error for our review:

> I. Appellant's convictions were against the manifest weight of the evidence.
>
> II. Appellant received ineffective assistance of counsel in violation of the United States and Ohio Constitutions.
>
> III. The cumulative effect of errors during trial deprived Appellant of a fair trial.

**Law and Analysis**

**I. Manifest Weight**

{¶ 23} In her first assignment of error, Singleton argues that her convictions were against the manifest weight of the evidence. Specifically, Singelton argues that there were inconsistencies among the state's three witnesses, as well as inconsistencies in individual witness's testimony. Singleton argues that while Young testified that Singleton was hanging out of the window of the blue car, Hampton, who was closer to the vehicle, testified that Singleton was not hanging out of the window but rather laying across the backseat. Singleton also points out that at trial, Young testified that Singleton shot at the house, but upon Dunn's review of the incident report, "it didn't appear clear whether [the witnesses] actually saw who had

fired the round at the house." Further, Singleton points to what she describes as exaggerations in Young's testimony, including Young's statement that her son was covered in glass while sleeping in bed directly under the window that had been shot.

{¶ 24} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). On a manifest weight challenge, "a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus. A reversal on the basis that a verdict is against the manifest weight of the evidence is granted ""only in the exceptional case in which the evidence weights heavily against the conviction."" *State v. Parks*, 8th Dist. Cuyahoga No. 112596, 2023-Ohio-4316, ¶ 42, quoting *Thompkins* at 387, quoting *Martin* at 175.

{¶ 25} Our review of the record does not lead us to conclude that this is the exceptional case in which the evidence weighs heavily against the conviction and

reversal is warranted. While there were minor inconsistencies in the witness testimony, these inconsistencies do not undermine the credibility of any witness, let alone the integrity of Singleton's convictions. Whether or not Singleton was laying across the backseat of the car or hanging out of the window — or doing both, at various points — has no bearing on the testimony that following a verbal and physical altercation with Young, Singleton followed Young to Hampton's house and fired a gun in the direction of the home and Young, Williams, and Hampton. Further, we note that while the altercation between Singleton and Young went on for a significant period of time and spanned multiple locations, the firing of a single shot from a vehicle happened in a mere moment. Moreover, the evidence presented shows that the women involved in the fight, except for Hampton, were drinking and Raneka's testimony specifically was that she was "drunk" and that everything happened very fast. Given these chaotic circumstances, it is not unreasonable that the witness testimony contained minor inconsistencies.

{¶ 26} Finally, with respect to Young's alleged exaggerations regarding the amount of glass on her young son, we note that Young's perception of the glass was likely impacted by her heightened emotional state and the danger presented to her son and herself. Further, regardless of how much glass was or was not covering the child, the physical evidence presented at trial shows that a shot was fired at the house, hit the window above where the child was sleeping, and a bullet was lodged in the window frame. While a perceived exaggeration in the amount of glass may perhaps impact Young's credibility overall, it does not have such a negative impact

on her credibility as to constitute a manifest miscarriage of justice. Viewing the evidence in its totality, we cannot conclude that the minor inconsistencies in the trial testimony constitute a manifest miscarriage of justice. Singleton's convictions are not against the manifest weight of the evidence. Therefore, Singleton's first assignment of error is overruled.

## II. Ineffective Assistance of Counsel

{¶ 27} In Singleton's second assignment of error, she argues that she received ineffective assistance of counsel. Specifically, Singleton argues that her counsel failed to object to what she classifies as instances of prosecutorial misconduct; defense counsel failed to effectively cross-examine Young; and defense counsel failed to challenge the admission of crime scene photographs and the bullet fragment.

{¶ 28} Article I, Section 10 of the Ohio Constitution and the Sixth Amendment to the United States Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 29} To establish ineffective assistance of counsel, Singleton must demonstrate that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 98, citing *Strickland* at 687.

The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case and it must give great deference to counsel's performance. *Id*. at 689.

{¶ 30} With respect to Singleton's claim that trial counsel failed to object to instances of misconduct, Singleton asserts that the assistant prosecuting attorney asked leading questions of Raneka, even though Raneka had not been declared hostile or a court's witness, and trial counsel should have objected. Singleton also argues that the assistant prosecuting attorney argued facts not in evidence during closing argument when they referenced police collection of evidence from the crime scene.

{¶ 31} As an initial matter, we note that failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 82, citing *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). Failing to object may sometimes be viewed as tactical. *Id*.

{¶ 32} Because neither of the instances pointed out by Singleton constituted prosecutorial misconduct, we cannot find that trial counsel was deficient for failing to object to them. With respect to the state's examination of Raneka, our review of the record reveals that there were ample discussions as to whether Raneka would be

considered hostile or presented as a court's witness. Further, the record reflects that Raneka testified repeatedly that she was scared and overwhelmed and that she felt pressured. We cannot conclude that trial counsel's decision not to object during such fraught witness testimony was not a valid trial strategy.

{¶ 33} With respect to statements made during closing argument, we note that while the investigation in this case, at least as discussed at trial, was somewhat scant, nothing in the state's closing argument constituted prosecutorial misconduct. The assistant prosecuting attorney summarized the investigation; this did not amount to arguing facts not in evidence.

{¶ 34} With respect to Singleton's assertion that trial counsel failed to effectively cross-examine Young, we note that "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Penland*, 2023-Ohio-806, 210 N.E.3d 1103, ¶ 87 (8th Dist.), citing *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. "Moreover, "'[a]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.'"" *Id.*, quoting *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. Franklin No. 04AP164, 2004-Ohio-3887, ¶ 40.

{¶ 35} After careful review of the record, we cannot conclude that trial counsel's cross-examination was so deficient as to constitute ineffective assistance of counsel. Therefore, Singleton's second assignment of error is overruled.

**III. Cumulative Error**

{¶ 36} In her third assignment of error, Singleton argues that cumulative error deprived her of a fair trial. Specifically, Singleton argues that she failed to maintain contact with trial counsel prior to trial and that the evidence was inadequate.[2]

{¶ 37} Under the cumulative error doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. *State v. Castellon*, 8th Dist. Cuyahoga No. 106813, 2019-Ohio-628, ¶ 44, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). To find cumulative error, we must first find that there were multiple errors committed at trial and, secondly, we must conclude that a reasonable probability exists that the outcome of the trial would have been different but for the combination of harmless errors. *Id.*, citing *Madrigal*, 87 Ohio St.3d at 398, 721 N.E.2d 52.

---

[2] We note that despite these assertions, Singleton has not raised an assignment of error on appeal challenging the sufficiency of evidence supporting her convictions, nor has she argued that her apparently inconsistent communications with her trial counsel throughout pretrial proceedings constituted ineffective assistance of counsel.

{¶ 38} Here, we have not found that any errors occurred at trial. Therefore, we cannot conclude that cumulative error deprived Singleton of a fair trial. Singleton's third assignment of error is overruled.

{¶ 39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
EMANUELLA D. GROVES, J., CONCUR