[Cite as *State v. Jones*, 2025-Ohio-2144.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 114038 |
| v. | : | |
| SHANAJA JONES, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 18, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-687997-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt, Assistant Prosecuting Attorney, *for appellee.*

Scott J. Friedman, *for appellant.*

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Shanaja Jones ("Jones") appeals from her convictions and sentence for aggravated murder and related offenses. For the following reasons, we affirm in part, reverse in part, and remand for resentencing.

**Factual and Procedural History**

{¶ 2} On January 19, 2024, a Cuyahoga County Grand Jury indicted Jones on one count of aggravated murder in violation of R.C. 2903.01(A), one count of murder in violation of R.C. 2903.02(A), one count of murder in violation of R.C. 2903.02(B), two counts of felonious assault in violation of R.C. 2903.11(A)(1), two counts of felonious assault in violation of R.C. 2903.11(A)(2), and one count of attempted murder in violation of R.C. 2923.02 and 2903.02(A). All counts carried one- and three-year firearm specifications.

{¶ 3} These charges arose from a June 3, 2023 shooting in which Bemetrious Hargrave ("Hargrave") was killed and Anthony Alexander ("Alexander") was wounded.

{¶ 4} Hargrave was walking down Dibble Ave. in Cleveland, Ohio, with his cousin Jordon Ivery ("Ivery") and a friend Bra'Kiah Peters ("Peters"). Ivery testified that earlier that day, he and Hargrave had driven to White Ave. — two blocks south of Dibble Ave. — so that he could get his hair done. According to Ivery, Hargrave wanted to see Peters, who lived on Dibble Ave., so the two walked up the street to Dibble Ave. and met up with Peters.

{¶ 5} Peters, a high school senior at the time of trial, testified that she knew Hargrave through her boyfriend and they saw each other weekly and played video games together almost every day.

{¶ 6} According to Peters, Jones pulled up in her black Alfa Romeo when Peters, Hargrave, and Ivery were standing on East 55th St. between Dibble Ave. and

Luther Ave. Peters testified that Jones was driving the car, Jones's cousin Walt was in the front passenger seat, and another male she did not know was in the backseat. Ivery testified that the car was noteworthy because it was a rare make and this car had a bullet hole in the rear passenger door. Ivery testified that he could not identify the people in the car because the windows were tinted.

{¶ 7} Jones and Peters greeted each other, and Walt got out of Jones's car and hugged Peters before getting back into the vehicle. Following this short interaction, Jones drove away and Hargrave, Ivery, and Peters continued up the street to a gas station. Peters testified that after purchasing some snacks, they went to McDonald's but the doors were locked so they made their way back down Dibble Ave.

{¶ 8} Thirty to 40 minutes after the interaction with Jones, Peters testified that she was standing outside of her grandmother's house on Dibble Ave. and talking to Hargrave and Ivery. At that time, around 8 p.m., a black car with tinted windows pulled up and stopped and two men got out of the backseat and began shooting at them. Peters testified that she did not know if the black car carrying the shooters was Jones's car. Ivery testified that the car carrying the shooters was the same Alfa Romeo from the earlier interaction. Peters and Ivery both testified that they ran in separate directions when they heard shots. Peters testified that she ran into a neighbor's backyard to hide and, while she saw the shooters, she could not identify them or meaningfully describe them. Peters remained hidden until she heard Ivery and her grandmother calling for her.

{¶ 9} Peters testified that she had seen the outline of a gun underneath Hargrave's hoodie before the shooting, but she did not see him fire his gun during the shooting. Peters testified that they found Hargrave on the ground in a neighbor's backyard. According to Peters, Hargrave still had a gun on him when she found him but she later found out that Hargrave's brother took the gun from Hargrave after the shooting.

{¶ 10} During Peters's testimony, the State played audio of her 911 call immediately after the shooting. In this call, Peters told the operator that Jones had shot at them.

{¶ 11} Hargrave sustained a fatal gunshot wound to his left chest. Alexander, who happened to be walking down the street at the time of the shooting, was also shot.

{¶ 12} Peters's grandmother Emma White ("White") testified that she was at home when she heard two or three gunshots and she ran outside because she knew that Peters was outside with Hargrave. The shooting was over by the time White came outside, and White testified that she saw Hargrave laying over a fence, shot, with a gun "laying on him."

{¶ 13} Deborah Dent ("Dent") testified that she lived on Dibble Ave. and came outside when she heard gunshots and voices. Dent testified that a man she recognized from the neighborhood but did not know — Alexander — was laying in her doorway saying that he had been shot. Dent testified that she told her daughter to call an ambulance and waited with Alexander until the ambulance came.

{¶ 14} Elizabeth Jenkins ("Jenkins"), a Cleveland paramedic, testified that she was dispatched to the scene of the shooting and treated Alexander, who had sustained two gunshot wounds to his lower back. Jenkins testified that Alexander told her he had been shot and she treated him on the scene and then transported him to the hospital.

{¶ 15} Police were also dispatched to the scene and began their investigation. Using the description of Jones's vehicle described above, they were able to identify the vehicle in surveillance footage. Vesna Piscittello ("Piscittello") testified that she was a civilian employee of the Cleveland Division of Police who worked as an analyst in the Real Time Crime Center. Piscittello testified that in this role, she reviewed surveillance footage from cameras in the areas surrounding homicide scenes. She testified that she conducted that review for this case and used the time and location of the shooting, as well as the vehicle information related to Jones's car, to compile relevant surveillance footage. The footage showed the vehicle turning down Dibble Ave. prior to the shooting, driving in the vicinity of Dibble Ave. immediately after the shooting, and ultimately turning into the driveway at the address where Jones's vehicle was registered. Piscittello testified that there were no cameras on Dibble Ave.

{¶ 16} Police subsequently learned that several days before the shooting, on May 30, 2023, Jones made a police report regarding a bullet hole in her car door. On June 7, 2023, police located Jones's car at East 83rd St. and Quincy Ave. in Cleveland, near an auto repair shop. After speaking with employees at the repair

shop, they learned that the car was dropped off two days before, on June 5, by a Black woman.

{¶ 17} Detective Steve Loomis ("Detective Loomis") testified that he worked in the Cleveland Division of Police Homicide Unit. Detective Loomis testified as to the investigation as described above, and he further testified as to his attempts to contact Jones. The following exchange took place during his direct examination:

> STATE: Were you able to make an appointment with Ms. Jones during that phone call?
>
> LOOMIS: We were able to tell her where we needed her to come, but we didn't finalize an appointment as to what time or anything like that.
>
> STATE: How come?
>
> LOOMIS: She hung up on us.
>
> STATE: During that phone conversation, was there any mention about a vehicle?
>
> LOOMIS: No, ma'am.
>
> STATE: Did Detective Legg ask her about her vehicle?
>
> LOOMIS: No, ma'am.
>
> STATE: Did she ask you — did she ask during that phone conversation "where is my Alfa Romeo?"
>
> LOOMIS: No, ma'am.
>
> STATE: After she hung up, were you still interested in [setting] up this meeting?
>
> LOOMIS: Yes, ma'am.
>
> STATE: So what happened next?
>
> LOOMIS: We thought that, you know, that may have been accidental. That happens. So we tried to call her back at the same number.

. . .

STATE: Did she answer?

LOOMIS: No, ma'am.

STATE: Did anything happen after that?

LOOMIS: Yes, ma'am.

STATE: What happened after you tried to call Ms. Jones back?

LOOMIS: Eight minutes after that final conversation or final attempt, we were contacted by a female claiming to be Ms. Jones's mother.

STATE: Were you present for that conversation, Detective?

LOOMIS: Yes, I was.

STATE: And previously during the call with Ms. Jones, was anything mentioned about her vehicle?

LOOMIS: No, ma'am.

STATE: Did she ask about it?

LOOMIS: She didn't ask about it nor did we.

STATE: And this call that was received, is there any way to verify that the person calling on her behalf was in fact her mom?

LOOMIS: No, ma'am.

(Tr. 768-770.).

{¶ 18} As a result of the investigation, a warrant was issued for Jones's arrest on August 12, 2023. Police arrested Jones the next day at a Walmart store in Cleveland after a brief chase through the store.

{¶ 19} The case proceeded to a jury trial at which the State presented the evidence described above. At the close of the State's case-in-chief, Jones made a

Crim.R. 29 motion for acquittal. The trial court denied the motion. The defense rested without presenting any evidence and renewed its Crim.R. 29 motion, which the court again denied.

{¶ 20} On May 3, 2024, the jury returned a guilty verdict on all counts and found Jones not guilty on all firearm specifications. On May 15, 2024, the court sentenced Jones to life in prison with the possibility of parole after 30 to 32 and one-half years.

{¶ 21} Jones presents the following six assignments of error, verbatim, for our review:

I. The appellant's convictions were against the manifest weight of the evidence, in derogation of the appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution.

II. The Appellant's convictions were not supported by sufficient evidence, in derogation of the Appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution.

III. The trial court erred because it allowed the jury to hear evidence that the Appellant invoked her right to remain silent, in violation of the Appellant's rights under the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

IV. The trial court erred because it failed to provide a self-defense jury instruction, in violation of the appellant's rights under the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

V. The Appellant was denied the effective assistance of counsel, in derogation of her rights under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

VI. The trial court erred because it considered the Appellant's silence when determining an appropriate sentence, in violation of her rights

under the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**Law and Analysis**

**I. Sufficiency of the Evidence**

{¶ 22} In Jones's first assignment of error, she argues that her convictions were against the manifest weight of the evidence. In her second assignment of error, she argues that her convictions are not supported by sufficient evidence. Jones provides the same arguments in support of these assignments of error. Specifically, Jones argues that her convictions were not supported by sufficient evidence and were against the manifest weight of the evidence because the State did not present any direct evidence, such as video surveillance, showing that Jones was at the scene at the exact moment the shooting took place. Jones argues that the evidence presented at trial only established, at most, that Jones's car was used to transport the shooters. We are not persuaded by these arguments. For ease of discussion, we will address Jones's second assignment of error first.

{¶ 23} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 24} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 25} Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.).

{¶ 26} Here, the jury found Jones guilty of aggravated murder, murder, felonious assault, and attempted murder under an accomplice theory. R.C. 2923.03(A), Ohio's complicity statute, provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall aid or abet another in committing the offense." This court has explained:

> The statute does not define "aid or abet," but the Ohio Supreme Court has stated that to aid or abet is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. Johnson*, 2001-Ohio-1336, quoting *Black's Law Dictionary* (7th Ed. 1999). "A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Seals*, 2015-Ohio-517, ¶ 34 (8th Dist.), citing *Johnson* at syllabus. Aiding and abetting may be shown by both direct and circumstantial evidence, and "'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is

committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).

*State v. Wilborn*, 2024-Ohio-5003, ¶ 42-44 (8th Dist.).

{¶ 27} Jones makes no argument specific to the elements of any of these offenses or to the accomplice theory of liability; rather, she asserts that there was no evidence placing her at the scene of the shooting or showing that she was the driver of the car that transported the shooters to and from the scene. Jones also argues that despite what she considers extensive surveillance of the surrounding areas, there was no video evidence placing her at the scene. According to Jones, the evidence established that, at most, Jones's car was used to transport the shooters.

{¶ 28} While there was no direct evidence showing that Jones was present at the scene at the exact moment the shooting occurred, the record contains sufficient circumstantial evidence placing her at the scene and driving her car. Peters testified that Jones was driving her car. While Ivery did not know Jones, he identified the car that delivered the shooters as the same car that approached the group earlier in the evening. Further, the absence of video evidence on Dibble Ave., despite ample video evidence from surrounding areas, does not mean that there was insufficient evidence supporting Jones's convictions. Therefore, Jones's second assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶ 29} In Jones's first assignment of error, she argues that her convictions were against the manifest weight of the evidence. Jones's arguments in support of this assignment of error mirror those in support of her second assignment of error.

{¶ 30} "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins* 78 Ohio St.3d at 387, quoting *Black's Law Dictionary* (6th Ed. 1990). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against conviction.'" *State v. Crenshaw,* 2020-Ohio-4922*,* ¶ 24, quoting *Thompkins* at 387.

{¶ 31} Jones repeats her argument that the State did not present any video evidence placing her at the scene at the time of the shooting. Moreover, she argues that while witnesses observed her driving her car earlier in the day, enough time elapsed between those observations and the shooting that someone else could have used her car to transport the shooters. Neither argument is persuasive.

{¶ 32} "'"[C]ircumstantial evidence and direct evidence inherently possess the same probative value."'" *Cleveland v. Imrie*, 2021-Ohio-308, ¶ 18 (8th Dist.), quoting *State v. Hartman*, 2008-Ohio-3683, ¶ 37 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "Accordingly, the State was not obligated to produce direct evidence that [Jones was driving her car];

circumstantial evidence permitting an inference of the same was all that was required." *State v. Pettaway*, 2025-Ohio-1181, ¶ 24 (8th Dist.).

{¶ 33} As discussed above, the State presented evidence that Jones was driving her car at the scene shortly before the shooting took place, as well as evidence that Ivery recognized Jones's car at the time of the shooting. This, together with the other evidence the State presented at trial, is enough to permit an inference that Jones was driving her car at the time of the shooting. This is not the exceptional case in which the evidence weighs heavily against conviction.

{¶ 34} For these reasons, Jones's first assignment of error is overruled.

## III. Right to Remain Silent

{¶ 35} In Jones's third assignment of error, she argues that the trial court erred because it allowed the jury to hear evidence that she invoked her right to remain silent, in violation of her rights under the Fifth and Sixth Amendments to the United States Constitution and the Ohio Const. art. I, § 10. Jones points to two things: testimony from Loomis regarding his attempts to reach Jones, and statements made by the assistant prosecuting attorney during the State's closing argument.

{¶ 36} "In general, 'use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination.'" *State v. Collins*, 2020-Ohio-4136, ¶ 47 (8th Dist.), quoting *State v. Leach*, 2004-Ohio-2147, syllabus. "Typically, post-arrest silence encompassed by the Fifth Amendment 'refers to a defendant's asserted silence during custodial

interrogation . . . .'" *State v. Hunt*, 2018-Ohio-1637, ¶ 28, quoting *State v. Perryman*, 49 Ohio St.2d 14 (1976), paragraph one of syllabus. One exception to the rule against use of a defendant's pre-arrest silence exists "where the state uses a defendant's pre-arrest silence as evidence of the 'course of the investigation.'" *Collins* at ¶ 47, citing *Leach* at ¶ 32.

{¶ 37} "'The failure to object to trial testimony forfeits all but plain error.'" *State v. White*, 2022-Ohio-2130, ¶ 36, citing *State v. Awan*, 22 Ohio St.3d 120, ¶ 20 (1986). Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." To constitute plain error under Crim.R. 52(B), the party asserting error must show "'(1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial.'" *White* at ¶ 37, quoting *State v. Pratts*, 2016-Ohio-8053, ¶ 34, citing *State v. Barnes*, 2002-Ohio-68. However, "'[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Mallory*, 2018-Ohio-1846, ¶ 17 (8th Dist.), quoting *State v. Long*, 53 Ohio St.2d 91, paragraph two of the syllabus (1978). The "extremely high burden" of demonstrating plain error is on the defendant. *State v. Chapman*, 2019-Ohio-1452, ¶ 20 (8th Dist.).

{¶ 38} In support of her argument here, Jones points to the testimony from Detective Loomis regarding his attempts to contact her during his investigation.

Further, Jones points out that the State, during closing arguments, made the following statement:

> $38,000 vehicle you've had for 70 days and it disappears and you have no interest in following up on it?
>
> Doesn't ask the detectives about the car. And by the way, they don't ask her about the car in that brief phone conversation. And before they can set up a date and time for her to come down, she hangs up. Doesn't answer.
>
> . . .
>
> It's the murder car. That's why you don't ask about it. It's the car you delivered the murder mechanisms in and whisked them away from the scene.

(Tr. 879-880.).

{¶ 39} According to Jones, the State used these references to her pre-arrest silence as evidence that encouraged the jury to infer guilt.

{¶ 40} After a thorough review of the record, we find no basis upon which to conclude that the statements in question constituted impermissible comments on Jones's silence that violated her Fifth Amendment privilege. The record reflects that the State was not eliciting testimony about Jones's pre-arrest silence, but instead asking Detective Loomis about the steps he took during his investigation. *State v. Lucas*, 2020-Ohio-1602, ¶ 107 (8th Dist.). This court has held that similar testimony was legitimate evidence related to the course of the investigation. *State v. Collins*, 2020-Ohio-4136, ¶ 49 (8th Dist.) ("[T]he detective's statement during direct examination about being unable to schedule an interview with [the defendant] and his statement on cross-examination about attempting to speak with [the defendant]

were admissible to explain the course of the investigation.") Therefore, we find no plain error related to Detective Loomis's testimony or the assistant prosecuting attorney's statement made during closing arguments. Jones's third assignment of error is overruled.

## III. Self-Defense Jury Instruction

{¶ 41} In Jones's fourth assignment of error, she argues that the trial court erred by failing to provide a self-defense jury instruction in violation of her rights under the Fifth and Sixth Amendments to the United States Constitution and the Ohio Constitution, article I, § 10.

{¶ 42} Jones does not dispute that her counsel did not object to the jury instructions; therefore, we must review for plain error. In considering whether jury instructions are incorrect due to plain error, "'an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions.'" *State v. Smith*, 2023-Ohio-1296, ¶ 38 (8th Dist.), quoting *State v. Nicholson*, 2022-Ohio-2037, ¶ 137, citing *State v. Wamsley*, 2008-Ohio-1195. "An improper or erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different." *Id.*, citing *Nicholson* at ¶ 137, citing *State v. Davis*, 2021-Ohio-2311 (8th Dist.), citing *State v. Cooperride*r, 4 Ohio St.3d 226 (1983). Therefore, to establish plain error here, Jones must demonstrate that her convictions clearly would have been different had the trial court instructed the jury on self-defense. *Id.*

{¶ 43} "A defendant is entitled to a self-defense jury instruction when [s]he presents legally sufficient evidence for every element of a self-defense claim." *State v. Palmer*, 2024-Ohio-539, ¶ 1. In Ohio, a person may use deadly force in self-defense when he or she:

> (1) "'was not at fault in creating the situation giving rise to the affray'"; (2) "'had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force'"; and (3) "'did not violate any duty to retreat or avoid the danger.'" (Brackets added in *Messenger*.)

*State v. Wilson*, 2024-Ohio-776, ¶ 20, quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 2002-Ohio-68.

{¶ 44} Here, not only did Jones not present legally sufficient evidence for every element of a self-defense claim at trial, but she never even referred to self-defense at trial. Further, there was never any evidence presented at trial that the shooters acted in self-defense. In the absence of any evidentiary basis on which to give a self-defense jury instruction, we cannot conclude that the claimed failure of the trial court to provide a self-defense jury instruction amounts to plain error. Therefore, Jones's fourth assignment of error is overruled.

## IV. Ineffective Assistance of Counsel

{¶ 45} In Jones's fifth assignment of error, she argues that she received ineffective assistance of counsel in violation of her constitutional rights. Specifically, she argues that her counsel was ineffective for failing to object to the testimony related to her pre-arrest silence and for failing to request a self-defense jury

instruction or otherwise argue self-defense. She further argues that the cumulative effect of these errors deprived her of effective assistance of counsel.

{¶ 46} U.S. Const., art. I, § 10 and amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* Our review of ineffective assistance of counsel claims requires us to give great deference to counsel's performance. *Id.* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.).

{¶ 47} With respect to Jones's argument that her counsel was ineffective for failing to object to testimony related to her pre-arrest silence, she argues that failing to object to testimony that was inadmissible under well-established caselaw clearly fell below an objective standard of reasonableness. We disagree.

{¶ 48} Ohio courts have consistently held that "'[c]ounsel is certainly not deficient for failing to raise a meritless issue.'" *State v. Carter*, 2018-Ohio-2238, ¶ 47, (8th Dist.), quoting *State v. Jackson*, 2006-Ohio-174, ¶ 87, citing *State v. Taylor*, 1997-Ohio-243. Specifically, a defense counsel's failure to object to evidence

is not ineffective assistance of counsel if the evidence is admissible. *Id*. For the reasons laid out in our discussion of Jones's third assignment of error, the testimony at issue here was properly admitted at trial. Therefore, we cannot conclude that counsel's conduct fell below an objective standard of reasonableness for failing to object to the testimony. Jones is unable to satisfy the first prong of the *Strickland* test related to the failure to object to testimony on her pre-arrest silence.

{¶ 49} With respect to the claim that trial counsel was ineffective for failing to request a self-defense jury instruction, or otherwise argue a theory of self-defense at trial, we are likewise unpersuaded.

{¶ 50} "Failure to assert an unviable defense does not constitute ineffective assistance." *State v. Davis*, 2021-Ohio-4015, ¶ 26 (8th Dist.), citing *State v. Roberts*, 1996 Ohio App. LEXIS 1873, *5 (8th Dist. May 6, 1996). As discussed in our analysis of Jones's fourth assignment of error, there was not sufficient evidence presented that supported a theory of self-defense, let alone entitled Jones to a self-defense jury instruction. Therefore, we cannot conclude that trial counsel's failure to pursue a self-defense theory at trial, including requesting a self-defense jury instruction, was deficient. Jones is unable to satisfy the first prong of the *Strickland* test related to her self-defense argument.

{¶ 51} Because Jones is unable to satisfy the first prong of the *Strickland* test for either of her arguments, we cannot conclude that her trial counsel was ineffective.

{¶ 52} Jones further argues that, even if none of her claimed errors rise to the level of prejudicial error, the cumulative effect of the errors deprived her of a fair trial.

{¶ 53} "Under the cumulative error doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Singleton*, 2024-Ohio-465, ¶ 37 (8th Dist.), citing *State v. Castellon*, 2019-Ohio-628, ¶ 44 (8th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197. "To find cumulative error, we must first find that there were multiple errors committed at trial." *Id.* Because we have not found any errors at trial, we therefore cannot find cumulative error. Jones's fifth assignment of error is overruled.

## V. Sentence

{¶ 54} In Jones's sixth and final assignment of error, she argues that the trial court erred because it considered her silence when determining an appropriate sentence, in violation of both the Ohio Constitution and the United States Constitution.

{¶ 55} When imposing Jones's sentence, the trial court made the following statements:

> What I think is even more of a tragedy is that the Court believes that Miss Jones still knows who the actual shooters were. So this tragedy did not end on that day back on June 3rd of 2023, it continues today because those folks are still out there. The shooters are still out there, and the evidence showed that you know who they are and you still have

yet to acknowledge that. And that to the Court is something that I'm certainly taking into consideration in formulating a sentence here.

(Tr. 917.).

After imposing the sentence, the court made the following statements on the record:

And what really bothers the Court is that you have the information and you could have helped yourself. And there are two individuals who are going to enjoy their Friday nights and Saturday nights and the rest of their lives while you sit in prison for potentially the rest of your life. So I hope whoever that is, that you love them that much that you are sacrificing for them. I'll never understand why you are throwing your life away for that.

(Tr. 924.).

{¶ 56} The Ohio Supreme Court has held that "when a defendant has maintained his or her innocence by pleading not guilty and has taken the case to trial, the trial court errs when it considers the defendant's silence to be a demonstration of that defendant's lack of remorse for purposes of sentencing under R.C. 2929.12(D)(5)." *State v. Brunson*, 2022-Ohio-4299, ¶ 83. The Court went on to state that "[t]o consider the defendant's silence as a lack of remorse in this context would create a negative inference regarding the factual determinations in the case" and such inference is prohibited. *Id.*, citing *Mitchell v. United States*, 526 U.S. 314 (1999).

{¶ 57} The State argues that the trial court's statements were referencing Jones's failure to identify her accomplices and this is separate from her privilege against self-incrimination. The State points to *State v. Lowery*, in which the Second District found that the appellant's failure to disclose the names of his accomplice to detectives was properly considered by the trial court at sentencing as indicative of

the appellant's lack of remorse.  *State v. Lowery*, 2023-Ohio-4444, ¶ 17 (2nd Dist.).

*Lowery* is easily distinguishable from the instant case.  In *Lowery*, the appellant had

pled guilty; here, Jones maintained her innocence and went to trial.

{¶ 58} Here, Jones maintained her innocence throughout the legal

proceedings.  Identifying her accomplices would imperil her privilege against self-

incrimination because to do so would be evidence that she was present at the murder

scene and/or was complicit.  Because of this, the trial court's comments at

sentencing constituted an improper consideration of her silence.  Therefore, Jones's

sixth assignment of error is sustained and the case is remanded for resentencing in

accordance with this opinion.

{¶ 59} Judgment affirmed in part, reversed in part, and remanded for

resentencing consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the

common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
WILLIAM A. KLATT, JUDGE*

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court
of Appeals.)